## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lena Angelella | : | Civil Action No. 3:15-CV-0511 |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| Robert Avvisato, Individually | : | |
| | : | **FILED** |
| and | : | **SCRANTON** |
| | : | |
| John Bonita, Individually | : | MAR 1 3 2015 |
| | : | |
| and | : | PER _____ |
| | : | DEPUTY CLERK |
| Joseph Adams, Individually | : | |
| | : | |
| and | : | |
| | : | |
| Steven Rinaldi, Individually | : | |
| | : | |
| and | : | |
| | : | |
| Pittston Township | : | |
| Defendants | : | |

## COMPLAINT

Plaintiff Lena Angelella, by and through her attorneys, Joseph F. Sklarosky, Sr., Esquire and Michael A. Sklarosky, Esquire for her Complaint alleges as follows:

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as a case arising under the laws of the United States and 28 U.S.C. §1343(a).  This action

arises under the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. §1983; 42 U.S.C. §1985 and Pennsylvania common law.

## VENUE

2.     Paragraph 1 is incorporated by reference as though set forth in full.

3.     The actions complained of herein occurred within the jurisdiction of this Court and involve Defendants who reside within its jurisdictional limits.

4.     Venue is invoked pursuant to 28 U.S.C. §1391(b) and 1391(c) because one or more of the Defendants reside in the judicial district and events or omissions giving rise to Plaintiff's claims have occurred in the Middle District of Pennsylvania.

## THE PARTIES

5.     Paragraphs 1 through 4 are incorporated herein by reference as though set forth in full.

6.     Plaintiff, Lena Angelella, (hereinafter "Ms. Angelella") is an adult woman who resides in Luzerne County, Pennsylvania, is a member of a protected class (sex–female), and who is employed by the Pittston Township Police Department.

7.     Defendant Robert Avvisato (hereinafter "Defendant Avvisato") is an adult male who was formerly the Chief of Police for Pittston Township. He was subsequently terminated from that position by the Pittston Township Board of Supervisors on or around July 25, 2014. He is being sued in his individual capacity for denying Ms. Angelella equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act as well as conspiring to deny her equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act, as well as 42 U.S.C. 1985(3).

8.     Defendant John Bonita (hereinafter "Defendant Bonita") is an adult male who is employed by Pittston Township as its Chief Financial Administrator. His duties are wide ranging and include but are not limited to timely filing reports with the State and Federal Governments; making sure payroll returns are filed; and keeping the minutes of the township. At all times relevant to the allegations of this Complaint, Defendant Bonita was employed and working in his capacity as Chief Financial Administrator for Pittston Township. He is being sued in his individual capacity for denying Ms. Angelella equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act as well as conspiring to deny her equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act, as well as 42 U.S.C. 1985(3).

9.     Defendant Joseph Adams (hereinafter "Defendant Adams") is an adult male who is the Chairman of the Board of Supervisors of Pittston Township. The Township's governing body consists of three supervisors elected to office by their fellow citizens. At all times relevant to the allegations of this Complaint, Defendant Adams was the Chairman of the Board of Supervisors of Pittston Township. He is being sued in his individual capacity for denying Ms. Angelella equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act as well as conspiring to deny her equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act, as well as 42 U.S.C. 1985(3).

10.    Defendant Steven Rinaldi (hereinafter "Defendant Rinaldi") is an adult male who is the Treasurer of the Board of Supervisors of Pittston Township. The Township's

3

governing body consists of three supervisors elected to office by their fellow citizens. At all times relevant to the allegations of this Complaint, Defendant Adams was the Chairman of the Board of Supervisors of Pittston Township. He is being sued in his individual capacity for denying Ms. Angelella equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act as well as conspiring to deny her equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act, as well as 42 U.S.C. 1985(3).

11.     Defendant Pittston Township (hereinafter "Defendant Township") is a second–class township located in Luzerne County in the Greater Pittston Metro area. As a second–class township, all Township activities are governed by the Pennsylvania Second–Class Township Code, which was enacted and amended in 1995. As a second–class township, its government consists of three supervisors, each with equal voting power, who exercise final policymaking authority within the Township government. Its three supervisors are currently: Defendant Adams, Defendant Rinaldi, and Barbaro Attardo. At all times relevant to the allegations of this Complaint, Defendant Township exercised control over the terms, conditions, and privileges of Ms. Angelella's employment with Pittston Township. The Township is being sued for denying Ms. Angelella equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act as well as conspiring to deny her equal protection of the laws on the basis of her sex (female) in contravention of the Fourteenth Amendment as enforced through Section 1983 of the Civil Rights Act, as well as 42 U.S.C. 1985(3).

4

## **FACTUAL ALLEGATIONS**

12.    Paragraphs 1 through 9 are incorporated herein by reference as though set in full.

13.    Ms. Angelella is employed as a Sergeant with the Pittston Township Police Department and has 18 years experience working in law enforcement.

14.    Upon graduating from the police academy, Ms. Angelella began her employment as a Municipal Police Officer with the Pittston Township Police Department in Luzerne County Pennsylvania.

15.    Ms. Angelella began her career in law enforcement as a Patrolman and currently holds the rank of Sergeant, attaining that in 2012.

16.    Despite being a female in a predominately male environment, Ms. Angelella has displayed a positive and professional attitude, has worked well with little or no supervision, investigated misdemeanor and felony crimes, which resulted in prosecution and convictions, assisted in search warrants, and testified numerous times in criminal proceedings.

17.    Ms. Angelella worked for Pittston Township until April 11, 2013, when she was placed on medical leave by Dr. Guy Fasciana.

18.    Since April 25, 2013, Ms. Angelella has been under the care of Dr. Matthew A. Berger.

19.    On or around December 17, 2012, Defendant Avvisato was appointed Chief of Police of the Pittston Township Police Department.

20.    Defendant Avvisato was appointed to the above–referenced position by the Pittston Township Supervisors.

21.    On or around December 18, 2012, Ms. Angelella met Defendant Avvisato for the first time on the sidewalk in front of the Pittston Township Police Department.

22.     After introducing herself to Defednant Avvisato, Ms. Angelella accompanied him into the police station where she introduced him to the police clerk and other officers who were in the building.

23.     At this time, in front of Patrolman Todd Houghtlin and Ms. Angelella, Defendant Avvisato said he was hired as Chief of Police "because he has more experience" than Ms. Angelella.

24.     In January 2013, Ms. Angelella and Defendant Avvisato worked day shift together for the first 3 weeks of January, until Ms. Angelella was moved to second shift (3p.m. – 11 p.m.) by the Township Supervisors.

25.     On one of the days Ms. Angelella and Defendant Avvisato were working day shift together, he began talking about why he was given the position of Chief of Police over Ms. Angelella. He said, "When a town hires a Chief outside of the department, it means there is a problem in the department, there is a broken link that needs to be fixed and the administration was not happy with the way things were being done. It is very rare for a town to hire outside of their department, it is a clear sign there is a problem."

26.     On or around Janaury 24, 2013, after Ms. Angelella came in at 3:00 p.m. for her scheduled shift, Defendant Avvisato approached Ms. Angelella and said, "I feel and I have told other people that you were not ready to be Sergeant because you cannot handle the pressure and the stress."

27.     On or around Janaury 24, 2013, Defednant Avvisato informed Ms. Angelella that the other officers in the department were "mad" at Ms. Angelella, because she was going to file a grievance about split shifts.

28.     At that point Defendant Avvisato was the only individual Ms. Angelella discussed the issue with.

29. On or around Janaury 24, 2013, Defendant Avvisato informed Ms. Angelella that, "the supervisors are getting mad at her because people are going back to them and reporting the bad things she is saying about them."

30. On or around January 28, 2013, Patrolman Stefanie Aversa informed Ms. Angelella that Defendant Avvisato told her that he was scolded by Defendant Rinaldi because Ms. Angelella was not at the prior weeks monthly meeting.

31. Patrolman Aversa informed Defendant Avvisato that Ms. Angelella was on call and she knows this for a fact because she was with her.

32. On or around February 10, 2013, Ms. Angelella had a day off and received a phone call from Defendant Avvisato.

33. Defendant Avvisato informed Ms. Angelella that a physical incident had occurred between Patrolman James Graham and Patrolman Stefanie Aversa. Defendant Avvisato wanted Ms. Angelella to conduct an internal investigation regarding the incident.

34. During the course of Defendant Avvisato's phone conversation with Ms. Angelella on or around February 10, 2013, he informed her that, "her stripes can come off at any time and she can be demoted."

35. On or around February 14, 2013, Ms. Angelella was working from 12:30 p.m.– 8:30 p.m., Patrolman Joseph O'Haire was working from 10:00 a.m.–6:00 p.m., Patrolman Ken Santos was working from 3:00 p.m.–11:00 p.m. and Patrolman Steve Wengen was working a shift at the Wilkes–Barre/Scranton airport from 12:00 p.m.–8:00 p.m.

36. On or around 6:00 p.m., Patrolman O'Haire received a phone call from Patrolman Wengen asking if he wanted to go to the Knights Inn and help he and Patrolman Santos pick up an individual wanted by State Parole.

37.     Despite being the officer in charge, Ms. Angelella was unaware of this situation.

38.     Ms. Angelella attempted to call Patrolman Wengen's cell phone three times but he would not pick it up.

39.     Ms. Angelella then attempted to call Patrolman Santos' phone and he informed her that "he just found out" and that he was at the airport picking Patrolman Wengen up because he had already spoken to Defedant Avvisato.

40.     Ms. Angelella advised Patrolman Santos to stay at the airport because she was on her way to talk the situation over with he and Patrolman Wengen.

41.     On her way to the airport, Ms. Angelella spoke to Defendant Avvisato who informed her that he forgot to tell her about it and he informed Patrolman Wengen he could leave for no longer than 30 minutes.

42.     Upon arriving at the airport Ms. Angelella was informed by security that Patrolman Santos and Wengen had both already left.

43.     Upon leaving the airport Ms. Angelella arrived at the property adjacent to the Knights Inn and found Patrolman Santos and Wengen with a few State Parole Officers.

44.     Subsequent to Ms. Angelella arriving at the Knights Inn, Patrolman Santos and Wengen both ended up back in their cruiser.

45.     After Patrolman Santos and Wengen entered their cruiser Ms. Angelella walked over to the passenger side of the vehicle and leaned on the door with her forearm resting on the vehicle.

46.     At this time, Ms. Angelella asked both of them why she was not informed that they were coming to the Knights Inn for this situation, because she was on duty and as their superior officer is responsible for them.

47.     At this time Ms. Angelella instructed Patrolman Santos to take Patrolman Wengen back to the airport where he belonged.

8

48.     As Patrolman Santos put the cruiser in gear, Patrolman Wengen stated, "No, I am not going. I orchestrated and started this whole thing and I am not going."

49.     Patrolman Wengen subsequently opened the passenger door of the cruiser and pushed Ms. Angelella with the door.

50.     At that point Ms. Angelella walked away from the cruiser and called Defendant Avvisato to inform him of the situation.

51.     Ms. Angelella informed Defendant Avvisato that Patrolman Wengen should be suspended for his actions, to which he agreed.

52.     On or around February 15, 2013, Ms. Angelella came into work and discussed the incident with Patrolman Wengen and Defendant Avvisato.

53.     Ms. Angelella informed Defendant Avvisato that she wanted Patrolman Wengen disciplined for being insubordinate and disrespectful.

54.     Defendant Avvisato informed Ms. Angelella that Patrolman Wengen was going to resign from the Pittston Township Police Department.

55.     Ms. Angelella continued to ask Defendant Avvisato about Patrolman Wengen's status, to which he informed her that he was still resigning.

56.     At some point on or around April 2013, Patrolman Wengen stopped by the Pittston Township Police Department to drop off his availability for the May schedule.

57.     Patrolman Wengen never resigned from the Pittston Township Police Department and was not disciplined by Defendant Avvisato for his actions.

58.     On or around December 15, 2014, Patrolman Wengen was promoted to full time status with the Pittston Township Police Department.

59.     On or around February 25, 2013, as she was getting ready for work, Ms. Angelella began to experience heart palpatations, chest tightness and heavy breathing.

60.     Ms. Angelella informed Defendant Avvisato that she could not come into work and then subsequently sought medical treatment with her family doctor.

61.     On or around February 28, 2013, Ms. Angelella arrived at work at 3:00 p.m. for her scheduled shift.

62.     Upon arriving at work, Ms. Angelella noticed a memo on the bulletin board stating that starting on March 15, 2013, only the Chief of Police can wear gold insignia on his uniform and all other ranking officers will wear silver.

63.     Ms. Angelella was the only ranking officer in the department at that time.

64.     Defendant Avvisato previously held a meeting with the department with regard to changing uniforms for all Patrolmen.

65.     Defendant Avvisato gave the rest of the department 30 days to comply with the uniform changes.

66.     Defendant Avvisato was only giving Ms. Angelella 15 days to comply with the request involving ranking officers, of which she was the only one.

67.     In or around Spring 2014, Patrolman Edward Sulima purchased a new K–9 badge for himself.  Patrolman Sulima's new badge was two toned silver and gold, similar to the one Ms. Angelella was directed to remove.

68.     Patrolman Sulima was not written up or told he needed to remove his badge, despite the fact he is not a ranking officer nor a full time officer.

69.     Patrolman Sulima is male.

70.     On or around April 9, 2013, Ms. Angelella was written up by Defendant Avvisato for not having a silver badge.

71.     On or around March 8, 2013, Ms. Angelella arrived at 3:00 p.m. for her scheduled shift.

72.     After Ms. Angelella punched in, she was informed by Defendant Avvisato that she was being written up for taking too long on March 7, 2013, to ask the other officer who was on duty to handle a crash that she was dispatched to.

73.     Defendant Avvisato also informed Ms. Angelella that she was no longer allowed to authorize another officer to handle her cars when she is on shift.

74.     This was the first time Ms. Angelella had been written up in her law enforcement career, Ms. Angelella was also unilaterally demoted by Defendant Avvisato and stripped of her authority as a Sergeant.

75.     On or around April 10, 2013, Ms. Angelella arrived at work at 3:00 p.m. for her scheduled shift.

76.     Upon arriving, Defendant Avvisato told Ms. Angelella, "Sergeant, when you are ready to talk to me about everything, let me know and we will sit down."

77.     Ms. Angelella responded that she would very much like that.

78.     One of the things that Ms. Angelella and Defendant Avvisato discussed was the aforementioned incident with Patrolman Wengen.

79.     Defendant Avvisato informed Ms. Angelella that he gave them an order to go to the Knights Inn and Ms. Angelella was assigned to another detail.

80.     Defendant Avvisato further informed Ms. Angelella that she had no right to be there and she had no right to know what was going on.

81.     Defendant Avvisato stated, "I am the chief and I knew what was going on, it was none of your business."

82.     Defendant Avvisato went on to inform Ms. Angelella that the whole Pittston Township Police Department is against her and does not like or respect her.

83.     As the conversation progressed, Ms. Angelella was standing by the copy machine with her back against the wall.

84.    At this point in time, Defendant Avvisato started walking toward Ms. Angelella in an aggressive manner.

85.    As he berated Ms. Angelella, Defendant Avvisato had to keep removing his hat to wipe the beads of sweat from his forehead.

86.    Defendant Avvisato then started asking Ms. Angelella about a crash that she handled sometime in March 2013.

87.    Defendant Avvisato informed Ms. Angelella that he was "very interested" in that call.

88.    Ms. Angelella told Defendant Avvisato the she was aware that he asked two officers to provide him with a written statement as to what occurred at the crash scene.

89.    Ms. Angelella also informed Defendant Avvisato that she was still in the process of investigating the crash and that she had to send evidence to the crime lab for testing.

90.    Defendant Avvisato told Ms. Angelella that she had a substance in her hand and "it was enough probable cause to do an investigation and take the driver and passenger into custody."

91.    Defendant Avvisato then told Ms. Angelella to read her "crimes code."

92.    Ms. Angelella informed Defendant Avvisato that she had discussed the matter with the Luzerne County District Attorney's office and that they informed her she handled the situation in an appropriate manner.

93.    At this time Ms. Angelella informed Defendant Avvisato that he was upsetting her, that her chest was getting tight and she was having chest pain.

94.    Ms. Angelella told Defendant Avvisato that she would talk to him another time.

95.    As Ms. Angelella was walking away, Defendant Avvisato stated, "fine, if that is the way you want to be; now I am opening a criminal investigation on you."

96.     At that point, Ms. Angelella told Defendant Avvisato that she was too upset to work and needed to go home.

97.     Defendant Avvisato responded, "ok, find a replacement and go home, better yet, I will find your replacement, you just go."

98.     Defendant Bonita is responsible for setting up Heart and Lung Benefits, Workers' Compensation, and short-term disability.

99.     On April 11, 2013, Ms. Angelella gave Defendant Avvisato and the Pittston Township supervisors a note from Dr. Guy Fasciana, Ms. Angelella's family doctor, stating that she could not return to work due to severe anxiety.

100.    On or around April 25, 2013, Ms. Angelella was referred to Dr. Matthew Berger by Dr. Fascina.

101.    Ms. Angelella has treated with Dr. Berger's office from the above–referenced date to the present day.

102.    Due to the hostile work environment exacted against Ms. Angelella in connection with her work at the Pittston Township Police Department and the severe stress, she developed a serious health condition.

103.    On or around April 25, 2013, Ms. Angelella gave Defendant Avvisato and the Pittston Township Supervisors a doctors note stating that she could not return to work due to severe anxiety, as well as an application for Heart and Lung benefits.

104.    On or around May 9, 2013, Ms. Angelella sent the Pittston Township Supervisors an Employer's Report of Occupational Injury or Disease.

105.    Attached to this report Ms. Angelella included a 9 page attachment which outlined all of the incidents that occurred between Ms. Angelella and Defendant Avvisato and Patrolman Wengen.

106.    Ms. Angelella included this attachment because the space provided on the report was not sufficient.

107.    On the space provided on the report Ms. Angelella wrote "see attached."

108.    Shortly after turning her paperwork into the Pittston Township Supervisors, Ms. Angelella received a phone call from Defendant Bonita asking what "see attached" meant.

109.    Ms. Angelella explained to Defendant Bonita that because her explanation exceeded the space provided she included the 9 page attachment to the report.

110.    On or around May 21, 2013, Ms. Angelella received correspondence from the Pennsylvania Department of Labor & Industry Bureau of Workers' Compensation.

111.    Said correspondence stated that the Bureau was in receipt of the Employer's Report of Occupational Disease or Injury.

112.    Attached to the correspondence Ms. Angelella received from the Bureau was a copy of the report they received from Defendant Pittston Township.

113.    On the back of said report, where it asked for a description of how Ms. Angelella's injury occurred, it stated, "Claimant was doing reports, when she had severe anxiety, resulting in the injury."

114.    Upon reading this Ms. Angelella called the Pennsylvania Department of Labor & Industry Bureau of Workers' Compensation and spoke to James Shea, who was handling her claim.

115.    Ms. Angelella asked Mr. Shea who had submitted her report.

116.    Mr. Shea indicated that he spoke directly to Defendant Bonita and the report was prepared and submitted by Defendant Bonita.

117.    On or around May 17, 2013, Ms. Angelella provided Defendant Avvisato and Defendant Pittston Township a letter from Dr. Berger's office stating that she has been

under the care of his office since April 25, 2013, and she would be unable to return to work at this time due to severe anxiety and depression.

118.   Said letter stated that Ms. Angelella's symptoms have been exacerbated as a result of the current situation at work.

119.   On or around May 25, 2013, Ms. Angelella was advised in a letter from Defendant Pittston Township that no determination was made by the supervisors about her Heart and Lung benefits and that she was being placed on short term disability as per the collective bargaining agreement.

120.   At this point in time all of Ms. Angelella's accrued time was exhausted.

121.   After Ms. Angelella was placed on short term disability she only received 70% of her salary from Pittston Township.

122.   On or around June 6, 2013, Ms. Angelella received a letter from Defendant Pittston Township stating that the Township had purchased a disability insurance policy with Principal Financial and in order to establish a claim her physician needed to complete the attached disability form.

123.   On or around June 16, 2013, Ms. Angelella received an email from Defendant Bonita stating that he needed the disability form filled out and returned ASAP, because the insurance company would not honor the Township's claim without the form.

124.   On or around June 19, 2013, during a phone call with Defendant Bonita, Ms. Angelella asked if the form he previously sent her from Principal Financial had anything to do with her Heart and Lung application.

125.   Defendant Bonita stated that, "no it is a disability insurance, it has nothing to do with Heart and Lung." He went on to say, "we have been holding back the Heart and Lung benefits because we thought it would be resolved by now, I guess it is not."

126.    On or around June 26, 2013, Ms. Angelella received a letter from Defendant Pittston Township saying that the supervisors met with the Police Pension Committee to discuss her Heart and Lung application and that it was denied for lack of information.

127.    Despite being a member of the Pittston Township Police Department for over 17 years, this was the first time Ms. Angelella had ever heard of the Police Pension Committee.

128.    On or around July 2, 2013, Ms. Angelella received a letter from Defendant Pittston Township stating that the Township was sending her to Dr. Richard Fischbein for an Independent Medical Examination (hereinafter "IME").

129.    On or around July 5, 2013, Ms. Angelella called Defendant Bonita at the Township business office to inquire about the whereabouts of her paycheck, because all Township employees had received their paychecks on July 3, 2013.

130.    Defendant Bonita informed Ms. Angelella that, "I intentionally held your pay to get your attention, I want my disability form."

131.    Subsequent to this conversation with Defendant Bonita, Ms. Angelella called Principal Financial and was informed that no disability claim had been opened by the Defendant Pittston Township.

132.    On or around July 9, 2013, Ms. Angelella was informed by Dr. Berger's office that the disability form was completed and faxed to Principal Financial.

133.    On or around July 24, 2013, in a conversation with Defendant Bonita, he asked Ms. Angelella where his copy of the disability form was.

134.    Defendant Bonita stated that he needed to sign the form and mail it along with another form to the insurance company.

135.   On or around July 25, 2013, Defendant Bonita emailed Ms. Angelella asking "do you have a copy of the disability form."

136.   On or around July 25, 2013, Ms. Angelella called Principal Financial and spoke with a representative in the disability department.

137.   During said conversation Ms. Angelella was informed that Defendant Pittston Township was not carrying a disability policy with the company and that an employer's signature is not required on the form.

138.   On or around August 21, 2013, Ms. Angelella received an email from Defendant Bonita stating that the insurance company had no record of her disability filing.

139.   On or around August 22, 2013, Ms. Angelella received a phone call from Defendant Bonita stating that he spoke with a representative from Hartford Insurance and they confirmed they did not receive a disability form.

140.   Defendant Bonita further stated that as far as he was concerned Ms. Angelella did not file the form and the process would have to be started over.

141.   During the course of the above-referenced conversation, Ms. Angelella asked Defendant Bonita why he was speaking to a representative from Hartford Insurance when the disability form he previously sent to her was from Principal Financial.

142.   During the course of the above-referenced conversation, Defendant Bonita told Ms. Angelella that Principal Financial and Hartford Insurance were the same company.

143.   Subsequent to the conversation Ms. Angelella had with Defendant Bonita on or around August 22, 2013, she called Hartford Insurance and spoke to a representative in claims.

144.   During the course of this conversation Ms. Angelella was informed that Hartford Insurance and Principal Financial are not the same company.

145.   Ms. Angelella was further informed that the Hartford Insurance disability form is 7 pages long.

146.   The disability form that Ms. Angelella filled out for Principal Financial was only 2 pages long.

147.   The claims representative from Hartford Insurance sent Ms. Angelella the application for disability.

148.   On or around August 22, 2013, Ms. Angelella again spoke to Defendant Bonita with regard to the disability form.

149.   Ms. Angelella informed Defendant Bonita that she spoke to a representative from Hartford Insurance and they are not the same company as Principal Financial.

150.   Ms. Angelella further informed Defendant Bonita that he sent her the wrong disability form.

151.   During the course of this conversation Defendant Bonita told Ms. Angelella to, "hold tight, I will get back to you."

152.   To date, Ms. Angelella has not heard back from Defendant Bonita regarding the disability form.

153.   On or around September 9, 2013, Ms. Angelella, via certified mail, sent Defendant Pittston Township her completed section of the Hartford Insurance disability form as well as her doctor's completed section of the form.

154.   Ms. Angelella mailed same to Hartford Insurance.

155.   On or around September 13, 2013, Ms. Angelella received correspondence from Hartford Insurance stating that in order to evaluate her claim, they would need the completed employer portion of the form from Defendant Pittston Township.

156. On or around October 11, 2013, Ms. Angelella received correspondence from Hartford Insurance stating that they had yet to receive the completed employer portion of the disability form from Defendant Pittston Township.

157. On December 12, 2014, a week before she was scheduled to return to work, Ms. Angelella received a phone call from Hartford Insurance indicating that they had received the completed employer portion of the form from Defendant Pittston Township.

158. Defendant Bonita and Defendant Pittston Township have done everything in their power to add to Ms. Angelella's emotional distress since she was placed on medical leave.

159. Ms. Angelella has received at least 3 letters from Defendant Pittston Township threatening to terminate her employment.

160. Ms. Angelella had her pay cut off by Defendant Pittston Township.

161. Defendant Bonita harassed Ms. Angelella over a disability form that was from the incorrect insurance provider.

162. Because Defendant Bonita provided Ms. Angelella with the wrong form, Defendant Pittston Township was able to stop Ms. Angelella's pay in September 2013.

163. Ms. Angelella went without pay for over 11 months.

164. As a result of not being paid, Ms. Angelella was forced to file for heating assistance through the Low–Income Home Energy Assistance Program (LIHEAP).

165. As a result of not being paid, Ms. Angelella became eligible for food stamps in February 2014.

166. Ms. Angelella received food stamps from February 2014 through August 2014.

167. In or around 2010 Defendant Bonita handled then Patrolman John Rinaldi's Heart and Lung paperwork without incident.

168.   In or around 2011 Defendant Bonita handled then Patrolman Leonard Trotta's disability paperwork without incident.

169.   In or around the fall of 2013 Defendant Bonita handled Patrolman Joseph Hawk's Heart and Lung paperwork without incident.

170.   The above–referenced officers were all male.

171.   On or around March 28, 2014, Ms. Angelella received a phone call from Patrolman Todd Houghtlin.

172.   During the course of the above–referenced phone call, Patrolman Houghtlin informed Ms. Angelella that he recently had a conversation with Defendant Avvisato at the Pittston Township Police Department.

173.   Patrolman Houghtlin informed Ms. Angelella that Defendant Avvisato stated he was hired by Defendant Adams and Defendant Rinaldi to harass Ms. Angelella until she quit her job or did something so that she could be fired.

174.   During the course of this conversation Defendant Avvisato stated that he would have meetings with Defendant Adams, Defendant Rinaldi, and Defendant Bonita, and they would all urge him to fire Ms. Angelella.

175.   During the course of said conversation Defendant Avvisato stated that the Township Supervisors would instruct him to put Ms. Angelella on midnight shift because they did not want to see her face.

176.   On or around April 25, 2014, Ms. Angelella received a text message from Patrolman Stefanie Aversa.

177.   Said text message said that Patrolman Aversa had just had a conversation with Defendant Avvisato.

178.   Said text message said that during the course of the conversation Defendant Avvisato said he "hates" Defendant Bonita.

179.   Said text message said that during the course of the conversation Defendant Bonita told Defendant Avvisato, "fire Lena, I want her fired."

180.   On or around June 2014, Ms. Angelella received a copy of correspondence Defendant Pittston Township sent to Defendant Avvisato.

181.   Said correspondence was dated May 21, 2014, and indicated that interviews were conducted with several full and part time officers of the Pittston Township Police Department.

182.   Ms. Angelella was never contacted nor interviewed by Defendant Pittston Township.

183.   Said letter indicated that as a result of the interviews, Defendant Pittston Township was concerned about the work environment which existed at the police department.

184.   Because of the complaints in this letter, Defendant Pittston Township terminated Defendant Avvisato as Chief of Police.

185.   Said letter outlines indirect verbal threats Defendant Avvisato made against Defendant Bonita, as well as Patrolman Joseph Hawk.

186.   When Ms. Angelella complained to Defendant Pittston Township about the hostile work environment that was directed towards her at the police department, no action was taken against Defendant Avvisato or Patrolman Wengen.

187.   This created a concerted pattern of harassment sufficiently pervasive to have altered the terms, conditions, and privileges of Ms. Angelella's employment on the basis of sex and denied her equal protection of the laws in violation of the 14th Amendment.

188.   It was clear that none of the Defendants would do anything to rectify the situation; as noted previously, but rather advocated the hostile environment and the

continuing on–going sex discrimination and denial of equal protection of the laws, and as a result, Ms. Angelella began experiencing serious health issues.

189.   Similarly situated males did not have to endure Defendant Avvisato's enduring harassment like Ms. Angelella, rather, he was terminated from his position as Chief of Police after male officers and Defendant Bonita complained about Defendant Avvisato's behavior.

190.   On or around August 26, 2014, Ms. Angelella sent Defendant Pittston Township a certified letter explaining that she was registered for the 2014 Mandatory In–Service Training required by MPOETC.

191.   In said letter Ms. Angelella requested that they forward payment to Lackawanna College for the course as they have done for her the last 16 years.

192.   Defendant Pittston Township responded with a letter stating that "Because of the on–going nature of the litigation involving your employment status with the Township you should make all arrangements and payments directly to Lackawanna College Police Academy."

193.   Ms. Angelella subsequently contacted Gene Rittel from the Fraternal Order of Police.

194.   Mr. Rittel and Mike Bohan, another member of FOP, spoke to Defendant Pittston Township and Defendant Bonita on Ms. Angelell's behalf.

195.   After the above–referenced meeting Defendant Pittston Township agreed to pay for Ms. Angelella's mandatory training.

196.   This was a deliberate act by Defendant Pittston Township and Defendant Bonita to make sure Ms. Angelella did not have the necessary certifications, making it harder to return to work after being cleared by her doctor.

197.   Shortly after this incident, Ms. Angelella had a conversation with Patrolman Todd Houghtlin.

198.   Patrolman Houghtlin had been on medical leave since July 2014, because he donated a kidney to his son.

199.   Patrolman Houghtlin informed Ms. Angelella that while he was on medical leave, Defendant Pittston Township contacted him and informed him that he was registered for 2014 Mandatory In–Service Training classes being held September 22–25, 2014, at Pittston Area High School.

200.   Patrolman Houghtlin stated that he never asked Defendant Pittston Township to register him.

201.   Defendant Pittston Township knew that Patrolman Houghtlin needed to take the class to maintain his certification.

202.   Defendant Pittston Township made all the arrangements and paid for Patrolman Houghtlin's training, no questions asked.

203.   Patrolman Houghtlin is male.

204.   The Defendants treated similarly situated males more favorably than Ms. Angelella and conspired to discriminate against her because of her sex (female).

204.   On or around December 29, 2014, Ms. Angelella returned to work at the Pittston Township Police Department.

205.   On or around Janaury 22, 2015, Sergeant Hockenberry informed Ms. Angelella that in 2014 when Defendant Avvisato received a copy of Ms. Angelella's Workers' Compensation ruling, he left it on a desk in the police department for all of the other officers to read.

206.   On or around January 26, 2015, Patrolman Wengen informed Ms. Angelella about the availability of said Workers' Compensation ruling as well.

207.    Said Workers' Compensation ruling contained personal medical information of Ms. Angelella's.

208.    This was a deliberate act by Defendant Avvisato designed to embarrass Ms. Angelella and harm her reputation.

209.    As a result of Defendants' discriminatory actions against Ms. Angelella, she has suffered greatly, including but not limited to, loss of her employment, loss of her income and benefits, loss of her enjoyment of life, and loss of her reputation.

210.    Thus, Defendants' individual and collective adverse actions against Ms. Angelella are on–going and in violation of federal law.

**COUNT I**
**Claim Under 42 U.S.C. §1983**
**Violations of the Fourteenth Amendment**

*Against Defendants Avvisato, Bonita, Adams, Rinaldi and Pittston Township*
*Collectively and Individually*

211.    Paragraphs 1 through 210 are incorporated herein by reference as though set forth in full.

212.    Ms. Angelella is an adult citizen of the United States who has the right to equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution.

213.    By virtue of Ms. Angelella's sex, she is a member of a particular and clearly identifiable group of people.

214.    Defendants Avvisato, Bonita, Adams, Rinaldi and Pittston Township acted under color of law and subjected Ms. Angelella to deprivation of rights, privileges, or immunities secured by the United States Constitution.

215.    Each and every one of these Defendants were personally involved, by either personal direction, actual knowledge and acquiescence, or direct discrimination in the denial of equal protection of the laws to Ms. Angelella in violation of the Fourteenth Amendment .

216.    Defendant Avvisato, who was the Chief of Police at all times relevant hereto, was responsible for the adverse actions against Ms. Angelella by exercising personal direction, actual knowledge and acquiescence, and direct discrimination.  Defendant Avvisato allowed disparate and abusive treatment to be issued against Ms. Angelella for the entire duration of his time as Chief of Police from December 2012 to July 2014. This included but is not limited to all of the factual allegations made in this Complaint.

217.    Defendant Bonita personally directed the disparate treatment of Ms. Angelella as well as personally discriminated against Ms. Angelella including but not limited to the factual allegations made in this Complaint.

218.    Defendant Adams, who was the Chairman of the Board of Supervisors of Pittston Township at all times relevant hereto, was responsible for the adverse actions against Ms. Angelella by personally directing the disparate treatment as well as personally discriminating against Ms. Angelella including but not limited to the factual allegations made in this Complaint.  Defendant Adams was deliberately indifferent to the violations of Ms. Angelella's constitutional rights.  Furthermore, as a member of the Board of Supervisors of Pittston Township, Defendant Adams possessed final policymaking authority within the Township government.

219.    Defendant Rinaldi, who was the Treasurer of the Board of Supervisors of Pittston Township at all times relevant hereto, was responsible for the adverse actions against Ms. Angelella by personally directing the disparate treatment as well as personally discriminating against Ms. Angelella including but not limited to the factual allegations

made in this Complaint.  Defendant Rinaldi was deliberately indifferent to the violations of Ms. Angelella's constitutional rights.  Furthermore, as a member of the Board of Supervisors of Pittston Township, Defendant Rinaldi possessed final policymaking authority within the Township government.

220.    Defendant Pittston Township, led by its aforementioned supervisors, who were deliberately indifferent to violations of Ms. Angelella's constitutional rights, and exercised final policymaking authority within the Township government, approved of and directed the actions of Defendants Avvisato and Bonita including but not limited to the factual allegations made in this Complaint.

221.    These Defendants violated Ms. Angelella's Fourteenth Amendment Rights to equal protection of the laws when they hired Defendant Avvisato with the intention of having him harass her until she quit or committed an offense that would permit her to be terminated from her employment, taking no action after she reported the harassing and discriminate conduct of Defendant Avvisato, denying and/or limiting her benefits, issuing arbitrary demands that only applied to her, taking no action after she reported the incident of being physically accosted by Patrolman Wengen, and refusing to take any action when she reported that a hostile work environment existed that was directed towards her.

222.    As a direct and proximate result of Defendants' violations of Ms. Angelella's constitutional rights, Ms. Angelella has suffered monetary and compensatory damages, including lost pay, lost benefits, payment for medical treatment and damages for pain and suffering.

223.    Defendants' violations of Ms. Angelella's Constitutional Rights were wanton, willful and malicious.

224.   As a direct and proximate result of Defendants' violations, Ms. Angelella has suffered and continues to suffer injury, including without limitation, violation of her constitutional rights, emotional harm, mental anguish, distress, humiliation, severe anxiety, and loss of happiness and well–being.

225.   Defendants willfully violated Ms. Angelella's Constitutional Rights and Section 1983 of the Civil Rights Act and denied her equal protection of the laws because of her sex guaranteed under the Fourteenth Amendment and are liable to Ms. Angelella for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT II
## Claim Under 42 U.S.C. §1983 for Conspiracy

*Against Defendants Avvisato, Bonita, Adams, Rinaldi and Pittston Township*

226.   Paragraphs 1 through 242 are incorporated by reference as though set forth in full.

227.   Under color of state law, the Defendants' conspired and entered into express and/or implied agreements to deprive Plaintiff of her constitutional rights secured by the Fourteenth Amendment Rights to equal protection of the laws when they hired Defendant Avvisato with the intention of having him harass her until she quit or committed an offense that would permit her to be terminated from her employment, taking no action after she reported the harassing and discriminate conduct of Defendant Avvisato denying and/or limiting her benefits, issuing arbitrary demands that only applied to her, taking no action after she reported the incident of being physically accosted by Patrolman Wengen, and refusing to take any action when she reported that a hostile work environment existed that was directed towards her.

228.    The Defendants willfully participated in this illegal objective by various means, with the intent to further some purpose of the conspiracy, including but not limited to the factual allegations made in this Complaint.

229.    Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Ms. Angelella's constitutional rights.

230.    As a direct and foreseeable consequence of this conspiracy, Ms. Angelella was deprived of her rights under the Fourteenth Amendments to the United States Constitution.

231.    As a direct and foreseeable consequence of these deprivations, Ms. Angelella has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, harm to her reputation and pain and suffering.

## COUNT III
## Conspiracy In Violation of 42 U.S.C. §1985(3)

*Against Defendants Avvisato, Bonita, Adams, Rinaldi and Pittston Township*

232.    Paragraphs 1 through 247 are incorporated by reference as though set forth in full.

233.    Under color of state law, the Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving, either directly or indirectly, Ms. Angelella equal protection of the laws, and her rights and privileges under the laws on the basis of her sex–female, including but not limited to the factual allegations made in this Complaint.

234.    Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Ms. Angelella's constitutional rights.

235.    As a direct and foreseeable consequence of this conspiracy, Ms. Angelella was deprived of her rights under the Fourteenth Amendment to the U.S. Constitution.

236.    As a direct and foreseeable consequence of these deprivations, Ms. Angelella has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, harm to her reputation and pain and suffering.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Against Defendants Avvisato, Bonita, Adams, Rinaldi and Pittston Township*

237.    Paragraphs 1 through 252 are incorporated by reference as though set forth in full.

238.    Defendants acted individually and in concert to deprive Plaintiff of her constitutional rights secured by the Fourteenth Amendment Rights to equal protection of the laws with the hopes of having Ms. Angelella quit her job or commit a fireable offense.

239.    This caused Ms. Angelella to suffer various medical ailments and seek treatment from medical professionals.

240.    Because of the pervasive discrimination and hostility of the work environment directed towards Ms. Angelella, her doctor would not allow her to return to work.

241.    In combination with conduct described above, and in the rest of the Complaint, these actions evidenced a pattern of extreme and outrageous behavior pursued with the intent to cause Ms. Angelella to suffer severe emotional distress.

242.    As a result of Defendants' intentional and outrageous conduct, Ms. Angelella has suffered and continues to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals.

243.   As a direct and foreseeable consequence of those conditions, Ms. Angelella has suffered, and continues to suffer, disabling emotional, mental and physical harm.

### JURY DEMAND

Plaintiff hereby demands a jury trial as to all claims that may be tried to a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that this Honorable Court enter judgment in her favor and against Defendants and direct the following relief:

1.   Against Defendants Robert Avvisato, John Bonita, Joseph Adams, and Steven Rinaldi, an amount to be determined at trial, including punitive damages, plus interest;

2.   Against Defendant Pittston Township, an amount to be determined at trial, plus interest;

3.   For Plaintiff's attorneys' fees, pursuant to 42 U.S.C. §1988;

4.   For the costs and disbursements incurred in this action; and

5.   For such other and further relief as the Court deems just and proper.

LAW OFFICE OF JOSEPH F. SKLAROSKY, SR.

Joseph F. Sklarosky, Sr., Esquire
1575 Wyoming Avenue
Forty Fort, PA 18704
PA Attorney I.D.# 19000
P: (570) 283-1200
jfs@sklaroskylaw.com

Michael A. Sklarosky, Esquire
1575 Wyoming Avenue
Forty Fort, PA 18704
PA Attorney I.D. #311226
P: (570) 283-1200
mas@sklaroskylaw.com

```
Court Name: District Court
Division: 3
Receipt Number: 333843313
Cashier ID: tscott
Transaction Date: 03/13/2015
Payer Name: JOSEPH SKLAROSKY
----------------------------------
CIVIL FILING FEE
 For: JOSEPH SKLAROSKY
 Case/Party: D-PAM-3-15-CV-000511-001
 Amount:        $400.00
----------------------------------
Paper Check Conversion
 Check/Money Order Num: 8155
 Amt Tendered:  $400.00
----------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:     $0.00


Only when bank clears the check or
verifies credit of funds is the fee
or debit officially paid or
discharged. A $53.00 fee will be
charged for returned checks.
```