**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| Lena Angelella | : | Civil Action No.       3:15–cv–511 |
|          Plaintiff | : | |
| | : | Jury Trial Demanded |
| v. | : | |
| | : | Honorable A. Richard Caputo |
| Robert Avvisato, et al. | : | |
|          Defendants | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION TO DISMISS OF
DEFENDANTS JOHN BONITA, JOSEPH ADAMS, STEVEN RINALDI AND
PITTSTON TOWNSHIP**

## I.     RELEVANT FACTUAL ALLEGATIONS

Plaintiff, Lena Angelella, is an adult woman who has been employed by the Pittston Township police department for nearly 18 years.  (Compl. ¶¶6, 13).  Since 2012, Plaintiff has held the rank of Sergeant.  (Compl. ¶15).  Prior to the events outlined in her Complaint, she worked in a professional manner and investigated numerous misdemeanor and felony crimes, which resulted in prosecution and convictions.  (Compl. ¶16).

On or around December 17, 2012, Robert Avvisato (hereinafter "Defendant Avvisato") was appointed Chief of Police of the Pittston Township Police Department.  (Compl. ¶19).  This appointment was made by the Pittston Township Supervisors, which at the time included Joseph Adams (hereinafter "Defendant Adams") and Steven Rinaldi (hereinafter "Defendant Rinaldi).  (Compl.  ¶¶9-10, 20).  Plaintiff later learned that Defendant Avvisato was hired by the Defendants with the intention of harassing her until she quit her job with the Pittston Township police department or until she

committed an offense that permitted her lawful termination.  (Compl. ¶¶173-174).

Plaintiff also learned that Defendant Avvisato would have meetings with Defendant

Adams, Defendant Rinaldi, and John Bonita (hereinafter "Defendant Bonita"), who

would all urge him to fire her.  (Compl. ¶174).

 Shortly after Defendant Avvisato was hired as Chief of Police, Plaintiff had her

first interaction with him.  This occurred on or around December 18, 2012, at the

Pittston Township Police Department.  (Compl. ¶21).  In front of other members of the

police department, Defendant Avvisato stated that he was hired as Chief of Police

"because he has more experience" than Plaintiff.  (Compl. ¶23).  In January of 2013,

Defendant Avvisato made similar comments to the Plaintiff.  (Compl. ¶25-26).  First,

Defendant Avvisato told her that it is very rare for a department to hire an outsider,

and when they do, it means that there is a broken link that needs to be fixed and there

is a clear sign of a problem.  (Compl. ¶25).  Defendant Avvisato followed that up by

informing her that she was not ready to be a Sergeant because she cannot handle the

pressure or stress of the position.  (Compl. ¶26).   In addition, Defendant Avvisato

informed Plaintiff that the other officers in the department were "mad" at her because

she was going to file a grievance about split shifts.  (Compl. ¶27).  Up to that point, she

had not discussed the issue with anyone buy Defendant Avvisato.  (Compl. ¶28).

 During a phone conversation between Defendant Avvisato and Plaintiff on or

around February 10, 2013, he informed her that "her stripes can come off at any time

and she can be demoted."  (Compl. ¶34).  A few days later in February 2013, Plaintiff

reported to Defendant Avvisato the insubordinate behavior that Patrolman Wengen, a

male, directed towards her.  (Compl. ¶¶51-53).  This behavior included Patrolman

Wengen disobeying Plaintiff's commands, as well him physically shoving her with the

door of a police cruiser.  (Compl. ¶¶48-49).  Despite Plaintiff informing Defendant

Avvisato that she wanted Patrolman Wengen disciplined for his actions, he never was, and was later promoted to full time status in December 2014.  (Compl. ¶¶53, 57-58).  Additionally, in February 2013, Defendant Avvisato implemented a uniform change that was to take place on March 15, 2013.  (Compl. ¶¶61-62).  Defendant Avvisato's uniform change mandated that only the Chief of Police was allowed to wear gold insignia on his uniform and all other ranking officers were to wear silver.  (Compl. ¶62).  Plaintiff was the only ranking officer in the department at that time, and she was only given 15 days to comply with the change.  (Compl. ¶¶61-63).  Defendant Avvisato previously held a meeting with the department to discuss changing the uniforms for all of the Patrolmen and gave them 30 days to comply with the changes.  (Compl. ¶¶64-66).  Defendant Avvisato wrote Plaintiff up in April 2014 for not having a silver badge.  (Compl. ¶70).  Conversly, in the Spring of 2014, Patrolman Edward Sulima, a male, purchased a new K–9 badge for himself that was two toned silver and gold.  (Compl. ¶67).  Patrolman Sulima was not directed to remove his badge, nor was he written up, despite the fact he was neither a ranking officer nor a full time officer.  (Compl. ¶68).  This was the second time Plaintiff was written up in her career, the first occurred when Defendant Avvisato wrote her up in March 2013, for taking too long to ask another officer to respond to a call she was dispatched to.  (Compl. ¶72).  Defendant Avvisato also informed Plaintiff that she was no longer authorized to dispatch another officer to handle her calls and was stripped from her authority as Sergeant.  (Compl. ¶¶73-74).

In early April 2013, Plaintiff arrived for her scheduled shift and was asked by Defendant Avvisato if she was ready to talk to him about everything.  (Compl. ¶76).  She responded that she would like that.  (Compl. ¶77).  Defendant Avvisato and Plaintiff discussed various things, including but not limited to the aforementioned incident with Patrolman Wengen.  (Compl. ¶78).  During the course of the conversation

Defendant Avvisato informed Plaintiff that with regard to the Wengen incident, he was the Chief and it was none of her business what was going on.  (Compl. ¶81). Furthermore, he informed her that the whole Pittston Township Police Department was against her and does not like or respect her.  (Compl. ¶82).  As the conversation progressed, Defendant Avvisato walked toward Plaintiff in an aggressive manner and berated her.  (Compl. ¶¶84-85).  At this point, Plaintiff informed Defendant Avvisato that he was upsetting her, and that her chest was getting tight and she was experiencing chest pain.  (Compl. ¶93).  Plaintiff informed Defendant Avvisato that she was ending the conversation, going home, and that they would have to talk another time.  (Compl. ¶¶94, 96).  As she walked away, Defendant Avvisato told her that he was opening a criminal investigation on her.  (Compl. ¶95).

On April 11, 2013, Plaintiff gave Defendant Avvisato and the Pittston Township supervisors a note from Dr. Guy Fasciana, her family doctor, stating that she could not return to work due to severe anxiety.  (Compl. ¶99).  On or around April 25, 2013, she was referred to Dr. Matthew Berger by Dr. Fasciana.  (Compl. ¶100).  Also on that day, she gave Defendant Avvisato and the Pittston Township supervisors a doctors note stating that she could not return to work due to severe anxiety as well as an application for Heart and Lung benefits.  (Compl. 103).

Subsequently, in early May 2013, Plaintiff attempted to apply for Workers' Compensation Benefits.  (Compl. ¶104).  Attached to her application was a 9 page attachment outlining all of the incidents that had occurred between Defendant Avvisato, Patrolman Wengen, and herself.  (Compl. ¶105).  Plaintiff explained to Defendant Bonita that because her explanation exceeded the space provided she included the 9 page attachment.  (Compl. ¶109).  However, when Plaintiff received correspondence from the Pennsylvania Department of Labor & Industry the description

of how the injury occurred read "Claimant was doing reports, when she had severe anxiety, resulting in the injury." (Compl. ¶112-113).

On or around June 6, 2013, Plaintiff was informed by Defendant Pittston Township that no decision had been made regarding her Heart and Lung benefits and that she was being placed on short term disability per the terms of the collective bargaining agreement. (Compl. ¶119). A few days later, Plaintiff received correspondence from Defendant Township regarding a disability policy that had allegedly been purchased. (Compl. ¶122). Said correspondence indicated that the policy was through Principal Financial and in order to establish a claim her physician needed to complete the disability form. (Compl. ¶122). On or around June 16, 2013, Defendant Bonita informed Plaintiff that he needed the disability form filled out ASAP, because the claim could not be processed without it. (Compl. ¶123). Plaintiff subsequently received correspondence from Defendant Township indicating that the supervisors met with the Police Pension Committee to discuss her Heart and Lung application and that it was denied. (Compl. ¶126). Plaintiff had never heard of the Police Pension Committee, despite being employed at the Pittston Township Police Department for over 17years at the time. (Compl. ¶127).

Plaintiff and Defendant Bonita continued to correspond during this time frame for a number of reasons. (Compl. ¶129-151). She initially contacted Defendant Bonita when her paycheck was withheld in early July. (Compl. ¶129). During this time, Plaintiff contacted Principal Financial and learned that no disability claim had been opened by Defendant Township. (Compl. ¶131). Nonetheless, Defendant Bonita continued to harass Plaintiff over the disability form he allegedly needed. (Compl. ¶133-134). Plaintiff again contacted Principal Financial and was informed that Defendant Township was not carrying a disability policy with the company. (Compl.

5

¶137).  Defendant Bonita then contacted Plaintiff and informed her that he spoke to a representative of Hartford Insurance and they did not receive the aforementioned disability form.  (Compl. ¶139).  When asked by Plaintiff why he was speaking to Hartford Insurance instead of Principal Financial about the disability form, Defendant Bonita responded that they were the same company.  (Compl. ¶142).  Plaintiff then contacted Hartford Insurance and was informed that that they were not the same company.  (Compl. ¶144).  Additionally, Plaintiff learned that Hartford's form was 7 pages long, while the one she previously filled out was only 2 pages long.  (Compl. ¶¶145-146).  Plaintiff relayed this information to Defendant Bonita, and he informed her that he would get back to her.  (Compl. ¶¶148-151).  Plaintiff never heard back from Defendant Bonita regarding the form.  (Compl. ¶152).  She received the correct form directly from Hartford Insurance and returned same to Hartford and Defendant Township, after her doctor completed the pertinent section.  (Compl. ¶¶147, 153-154).  On December 12, 2014, a week before she was scheduled to return to work, and over three months after originally returning the completed form, Plaintiff received a phone call from Hartford Insurance indicating Defendant Township had completed and returned their portion of the disability form.  (Compl. ¶¶155-157).  Because of the treatment Plaintiff received from the Defendants, she went without pay for over 11 months.  (Compl. ¶163).  This caused her to file for heating assistance through the Low–Income Home Energy Assistance Program (LIHEAP) and receive food stamps from February 2014 through August 2014.  (Compl. ¶164-166).  Defendant Bonita handled the disability paperwork of two male Patrolman and the Heart and Lung paperwork of another male patrolman without incident.  (Compl. ¶167-170).

During late March 2014, while she was still out on medical leave, Plaintiff received a phone call from Patrolman Todd Houghtlin, who informed her about a

conversation he recently had with Defendant Avvisato at the Pittston Township Police Department.  (Compl. ¶172).  Patrolman Houghtlin conveyed to Plaintiff that Defendant Avvisato stated that he was hired by Defendant Adams and Defendant Rinaldi to harass her until she quit her job or could be fired, would have meetings with the aforementioned Defendants, as well as Defendant Bonita, and they would all urge him to fire her.  He also informed her that the Township Supervisors would instruct Defendant Avvisato to put Plaintiff on midnight shift because they did not want to see her face.  (Compl. ¶¶172-175).

In June 2014, Plaintiff received a copy of correspondence Defendant Township sent to Defendant Avvisato, terminating him as the Chief of Police.  (Compl. ¶¶180-184).  Said letter indicated that interviews were held with several full and part time officers and Defendant Avvisato was being terminated because of the work environment that existed at the police department.  (Compl. ¶¶181-183).  Plaintiff was never contacted or interviewed by Defendant Township.  (Compl. ¶182).  Said letter outlined indirect verbal threats Defendant Avvisato made against Defendant Bonita and Patrolman Joseph Hawk.  (Compl. ¶185).  No disciplinary action was taken against Defendant Avvisato or Patrolman Wengen when Plaintiff complained about the work environment.  (Compl. ¶186).  In addition, while Plaintiff was out on sick leave, she had to contact Gene Rittel and Mike Bohan, both members from the Fraternal Order of Police to speak to Defendant Township and Defendant Bonita on her behalf, regarding mandatory training classes she had to register for.  (Compl. ¶190-196).  Defendant Township initially refused to forward payment to Lackawanna College as they had previously done on numerous occasions for her.  (Compl. ¶192).  Shortly after Defendant Township changed its position, Plaintiff learned from Patrolman Houghtlin that while he was on sick leave, Defendant Township contacted him and informed him

that he was registered for a mandatory training class.  (Compl. ¶199).  Patrolman

Houghtlin did not ask Defendant Township to register him.  (Compl. ¶200).

When Plaintiff returned to work on or around January 22, 2015, she was notified

that Defendant Avvisato had left a copy of her Workers' Compensation ruling, which

contained sensitive medical information, on a desk in the police department for all of

the other officers to read.  (Compl. ¶204-208).

Plaintiff brings this action against the Defendants pursuant to violations of the

United States Constitution, federal statutes and Pennsylvania common law.

## II.  **ARGUMENT**

### A.  **Legal Standard**

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6), a district court must "accept all factual allegations as true, construe the

complaint in the light most favorable to the plaintiff, and determine whether, under any

reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v.

County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  The question at the Motion to

Dismiss stage is whether "the facts alleged in the Complaint, even if true, fail to

support the…claim…"  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d. Cir. 1988).  The

notice pleading standard of Federal Rule of Civil Procedure 8(a)(2)–which governs all of

the Plaintiff's allegations in the instant matter–does not require "detailed factual

allegations."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  It requires only that

a plaintiff plead sufficient facts to "give the defendant fair notice of what the … claim is

and the grounds upon which it rests."  Id.  (citing Conley v. Gibson, 355 U.S. 41, 47

(1957)).

A court may not dismiss a complaint merely because it appears unlikely that the

plaintiff can prove those facts or will ultimately prevail on the merits. See, Phillips, 515

F.3d at 231.  (citing <u>Twombly</u>, 550 U.S. at 556).  The pleading standard requires only that the complaint "state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Twombly</u>, 550 U.S. at 570).  The court must deny a motion to dismiss "if, in view of what is alleged, it can reasonably be conceived that the plaintiffs… could, upon a trial, establish a case which would entitle them to relief."  See <u>Phillips</u>, 515 F.3d at 233 (quoting <u>Twombly</u>, 550 U.S. at 563 n.8).

In deciding motions to dismiss, a court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and other documents that form the basis of a claim.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 221 n. 3 (3d Cir. 2004).

### B.   **Plaintiff's Claim for Punitive Damages against Defendant Pittston Township under Count I.**

Plaintiff concedes that a municipality is immune from an award of punitive damages and is only seeking said damages from the Defendants in their individual capacities.  This concession is solely against Defendant Pittston Township and is made for purposes of efficiency without admission.

### C.   **Plaintiff's Complaint States a Valid Cause of Action Under 42 U.S.C. §1985(3) Against Defendant Pittston Township.**

In their brief, Defendants state that townships are incapable of forming a mes rea sufficient to satisfy the animus or requirement of discriminatory motive under 42 U.S.C. §1985(3).  Defendants rely solely on the case of <u>Scott v. Bristol</u>, in advancing this theory.  <u>Scott</u>, Civ. Action No. 90–1412, 1990 U.S. Dist. LEXIS 15313, (Nov. 14, 1990).

In order to establish a §1985(3) conspiracy claim, it must be shown that there was an agreement between "two or more persons" to deprive an individual of his or her civil rights.  <u>42 U.S.C. §1985(3)</u>.  For purposes of 42 U.S.C. §1983, the Supreme

Court has held that a city was a "person" and could be held liable for an official policy, practice or custom casually linked to an employee's conduct that resulted in the injury to the plaintiff.  Monnel v. Department of Social Servs., 436 U.S. 658 (1978).  Using this rationale, the Second Circuit and several district courts have held that a city or local body is a "person" under §1985.  *See*  Owens v. Haas, 601 F. 2d 1242, 1247 (2d. Cir. 1979); Eiland v. Hardesty, 564 F. Supp. 930, 935 (N.D. Ill. 1982); Stathos v. Bowden, 514 F. Supp. 1288, 1293 (D. Mass. 1981); Gant v. Aliquippa Borough, 612 F. Supp. 1139 (W.D. Pa. 1985).

In Monnel, the court rejected respondeat superior liability for local governments, reasoning that "the touchstone of the §1983 action against a government body is an allegation that official policy is responsible for a deprivation."  *See*, Monnel 436 U.S. at 690.  Thus, a governmental entity is liable only for acts of its employee or agent that stem from a "custom, policy or practice" of the entity.  Id.  at 695.  This is noted because the court in Scott relied on Monnel's respondeat superior theory in holding that a municipality cannot form the requisite racial animus or mental state to maintain a §1985(3) claim.  *See*, Scott at *23.  In the present matter, the decision to hire Defendant Avvisato was made by the Pittston Township supervisors, which included both Defendants Adams and Rinaldi.  *See*, Compl.  ¶¶19-20.  The township supervisors have equal voting authority and exercise final policymaking authority within the Township government.  Id.  ¶11.

Additionally, the pattern of conduct directed towards the Plaintiff was not an aberration or isolated act.  Rather, the hiring of Defendant Avvisato for the purpose of harassing Plaintiff until she quit her job or could be lawfully terminated was a policy or practice of the Defendant Township, that was carried out by Defendants Avvisato and Bonita, who have been sued in their individual capacities.

10

Furthermore, the court in <u>Scott</u> adopted the "intracorporate conspiracy" doctrine[1], that was first applied to §1985(3) cases in <u>Dombrowski v. Dowling</u>, 459 F.2d 190 (7th Cir. 1972).  *See*, <u>Scott</u> at *16, 18.  The Third Circuit in <u>Novotny v. Great American Federal Sav. & Loan Ass'n</u>, 584 F.2d 1235 (3d Cir. 1978), rejected the notion that concerted action among corporate officers and directors cannot constitute a conspiracy under §1985(3).  Additionally, in <u>Rackin v. University of Pennsylvania</u>, 386 F. Supp. 992 (E.D. Pa. 1974), the plaintiff endured continuing instances of gender based discrimination and harassment by the defendant's various officers and members of the English Department.  The court distinguished <u>Dombrowksi</u> holding that the plaintiff's allegations constituted more than a single act of discrimination by a single business entity.

For the reasons set forth above, Plaintiff's complaint states a valid cause of action against Defendant Pittston Township for a violation of 42 U.S.C. 1985(3).

**D.**      **Plaintiff's Claim of Intentional Infliction of Emotional Distress Against Defendant Pittston Township Under Count IV.**

Plaintiff concedes that a municipality is immune from liability for intentional infliction of emotional distress and is only seeking said damages from the Defendants in their individual capacities.  This concession is solely against Defendant Pittston Township and is made for purposes of efficiency without admission.

**E.**      **Plaintiff Complaint States a Valid Claim of Intentional Infliction of Emotional Distress Against Defendants Bonita, Adams and Rinaldi.**

---

[1] This doctrine was developed in <u>Nelson Radio & Supply Co. v. Motorola Inc.,</u> 200 F.2d 911 (5th Cir. 1952).  <u>Nelson</u> was an antitrust case based on an alleged conspiracy between the defendant corporation and its officers, employees and agents.

To make out a claim for intentional infliction of emotional distress the applicable standard is "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm." Capresecco v. Jenkinstown Borough, 261 F.Supp.2d 319 (E.D. Pa. 2003).  (quoting Britt v. Chestnut Hill College, 632 A.2d 557, 561 (Pa. Super. 1993) (quoting Restatement (Second)  of Torts, §46(1)).  In addition to requiring that a plaintiff establish that the conduct complained of was outrageous, the Pennsylvania Supreme Court has required that the plaintiff present competent medical evidence to support the claim.  See, Britt, 632 A.2d at 561

This Court found that a viable cause of action for intentional infliction of emotional distress existed in Bowersox v. P.H. Glatfelter Co., 677 F. Supp. 307 (M.D. Pa. 1988).  In Bowersox, the plaintiff alleged that her employer sexually harassed her but also withheld information from her which she needed to perform her job, forbade her from talking to anyone in her office, prohibited her from answering the phone, and refused to talk to her and followed her throughout the plant.  Id.  at 312.

In the present matter Plaintiff has alleged a pattern of harassment and discriminatory treatment by the Defendants that lasted for close to two years.  The genesis of this treatment occurred when Defendant Avvisato was hired by the Defendant Township with the purpose of harassing Plaintiff until she quit her job or could be lawfully fired.  After she was subject to both verbal and physical harassment, as well as arbitrary demands that were only applicable to her, Plaintiff sought medical treatment from two doctors and was provided with documentation excusing her from work due to the severe anxiety she had developed.  Furthermore, as a result of

12

Defendant Bonita's actions, Plaintiff was not paid for 11 months and was forced to go on food stamps and apply for low–income assistance in order to heat her home[2].

The conduct of behavior Plaintiff had to deal with clearly rises to the level of outrageousness needed to support a claim for intentional infliction of emotional distress and is supported by credible medical evidence.  Accordingly, Count IV against Defendants Adams, Rinaldi, and Bonita should not be dismissed.

F.   **Plaintiff's Factual Allegations Prior to March 13, 2013, are Not Time–Barred with Respect to the Claims Set Forth in Counts II, III, and IV of the Complaint.**

For actions brought under 42 U.S.C. §1983 and 42 U.S.C §1985(3), federal courts apply the state's statue of limitations for personal injury actions.  Wilson v. Garcia, 471 U.S. 261, 276 (1985).  Federal law governs the accrual of §1983 and §1985 claims, and the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis for the action.  Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991).

In the present matter, Plaintiff did not exhibit physical injuries until April 10, 2013.  This was the date Plaintiff had to leave work after being berated by Defendant Avvisato.[3]  Up to that point, Plaintiff had no idea that the conduct being directed towards her was the intentional result of the Defendants conspiring against her.  It was not until Plaintiff's conversation in March 2014, with Patrolman Houghtlin that she became aware of this.  Plaintiff filed her complaint on March 13, 2015, this is clearly before the applicable statute of limitations.

---

[2] Plaintiff has provided specific examples of the behavior she endured in the Relevant Factual Allegations section of this brief.

[3] It should be noted that Plaintiff's Workers' Compensation Claim Petition averred that the work related injury occurred on April 10, 2013.

Furthermore, many of the incidents that Plaintiff alleged in her complaint overlap with one another, some parts allegedly occurring outside of the applicable period of limitation and other parts occurring in the applicable period of limitation.  For instance, the incident with Patrolman Wengen occurred on February 14, 2013.  The conversation between Defendant Avvisato and Plaintiff in which they discussed that incident and he berated her did not occur until April 10, 2013.  Defendant Avvisato issued his arbitrary demand with regard to Plaintiff's badge on or around February 28, 2013.  She was given until March 15, 2013 to acquiesce to this demand and was subsequently written up on April 9, 2013, for allegedly not complying with it.  Lastly, as previously mentioned, the conversation between Plaintiff and Patrolman Houghtlin occurred on March 28, 2014.  This was when she first learned about the reason for Defendant Avvisato's hiring and that the parties were conspiring against her.

In certain circumstances, the Third Circuit has held that the concept of equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed.  Oshiver v. Levin, et al., 38 F.3d 1380, 1387 (3d Cir. 1994).  In some instances, equitable tolling may be appropriate, such as: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.  Id.

Alternatively, the continuing violations doctrine is an equitable exception to the timely filing requirement.  Cowell v. Palmer Tp., 263 F.3d 286, 292 (3d Cir. 2001).  "The application of the continuing violations theory may be appropriate in cases in which a plaintiff can demonstrate that the defendant's allegedly wrongful conduct was part of a practice or pattern of conduct in which he engaged both without and within the

limitations period." <u>McAleese v. Brennan</u>, 483 F.3d 206, 218 (3d Cir. 2007).  In order to establish a claim under this doctrine, a plaintiff must do two things:  (1) he must demonstrate that at least one act occurred within the filing period and (2) he must establish that the conduct is more than the occurrence of isolated or sporadic acts, i.e. the conduct must be a persistent, on–going pattern." <u>Id.</u> (quoting West v. <u>Philadelphia Elec. Co.</u>, 45 F.3d 744, 754 (3d Cir. 1995)).

With regard to equitable tolling, Plaintiff submits that she has been misled by the Defendants since Defendant Avvisato was hired on December 17, 2012.  At that point in time Plaintiff had no idea that Defendant Avvisato was hired for the purpose of harassing her until she quit her job or could be terminated for cause.  Plaintiff did not become aware of the fact that the parties were intentionally directing this behavior towards her and conspiring against her until her phone conversation with Patrolman Houghtlin on March 28, 2014.

Plaintiff also posits that she satisfies the criteria for application of the continuing violations doctrine.  First, the vast majority of acts Plaintiff alleges in her complaint occurred within the applicable statute of limitations period.  Plaintiff has provided a chronological order of the majority of these events in the Relevant Factual Allegations section of this brief.  Secondly, the conduct Plaintiff endured was more than a mere isolated incident or sporadic event.  Rather, she endured a continuing and persistent pattern of discriminatory conduct that ultimately prevented her from performing her duties as Sergeant.  As noted above, this conduct continued even after she was medically excused from work and continued up until her return in December 2014, almost two years to the day Defendant Avvisato was initially hired.

For the reasons set forth above, Plaintiff should not be time–barred from presenting all of her factual allegations prior to March 13, 2013.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Honorable Court to deny the partial Motion to Dismiss of Defendants Pittston Township, John Bonita, Joseph Adams, and Steven Rinaldi.  A proposed Order is attached.

Respectfully submitted,

By:    /s/ Michael A. Sklarosky
Joseph F. Sklarosky, Sr., Esquire
PA Supreme Court ID No. 19000
Michael A. Sklarosky, Esquire
PA Supreme Court ID No. 311226
1575 Wyoming Avenue
Forty Fort, PA 18704
P:  (570) 283–1200
F:  (570) 283–5096
Counsel for Plaintiff